# INTER-ISLAND STEAM NAVIGATION COMPANY, LIMITED, *vs.* THE JAPANESE STEAMSHIP CHIUSA MARU.

## January 4, 1909.

*Admiralty—Salvage—Basis of compensation:*    The issues of fact upon which award of compensation is based are peril to salving vessels considered in relation to their value, peril to the libellee considered in relation to its value, condition of the sea and weather, assistance afforded by libelant's vessels considered in relation to assistance rendered by other agents, promptness of libelant in coming to the rescue of libellee with skill and courage shown, character of the sea bottom on which libellee was stranded with the extent to which she was stranded and likelihood of unfavorable weather setting in.

*Same—Same—Policy of courts of admiralty toward salvors:*    It is the policy of courts of admiralty to deal liberally with salvors in order to encourage promptness, as success may depend upon an early beginning of operations.

*Same—Same—Delay of decision as affecting compensation:*    Long delay in reaching a decision to be considered in favor of salvors in the estimate of compensation.

*Same—Same—Inclusion of crews of salving vessels in benefits prayed for in libels by owners:*    The practice of including the crews of salving vessels in compensation prayed for in libels by the owners, commended.

*In Admiralty*:    Libel *in rem* for salvage.

*Smith & Lewis,* Proctors for Libelant.

*Holmes & Stanley, R. W. Breckons* and *C. H. Olson,* Proctors for Libellee.

Dole, J.  The Chiusa Maru, libellee in this case, in approaching the harbor of Honolulu from Kobe, Japan, early in the morning of the 3rd of November, 1906, grounded, bow on, a little southeast of the entrance to the harbor.  In a little while the steam schooner Ke Au Hou, coming in from the island of Kauai, approached and offered its services, which were accepted on an understanding that the compensation should be arranged afterwards.  A hawser was then taken out to the Ke Au Hou and it commenced to pull right astern, almost due south.  This was at about half past six o'clock.  Later, the steamer, Kinau, coming in from the island of Hawaii, passed by into the harbor, landed her passengers and mails and returned to the stranded vessel and offered her services, which were accepted. She sent her own hawser to the Chiusa Maru and anchoring in a southeasterly direction, commenced to pull on the latter at about 10 :45 a. m., keeping up the strain until the Chiusa Maru floated off at about 1 :30 p. m.  Just before the steamship Kinau connected, an anchor weighing half a ton or less was taken out from the stern of the libellee in a southeasterly direction and placed, and the ship end of the hawser was placed in the ship's winch and a strain put on it.  A little while before noon, the United States Revenue Cutter Manning came out from Honolulu harbor and anchored in a westerly or southwesterly direction from the libellee and sent a hawser aboard and at about 12 :30 commenced to pull on such hawser.  At about 1 :30 p. m. the libellee, using her own engines during all this time, was floated, but was immediately compelled to stop her engines on account of the danger that her propeller would foul the hawser attached to the anchor put out as mentioned above; the Ke Au Hou towed the libellee stern first out to sea until she was in such a position that she could use her own engines; whereupon she went into the port of Honolulu under her own steam.

The Inter-Island Steam Navigation Company, Limited, the owner of the steamships Kinau and Ke Au Hou, thereafter brought its libel *in rem* against the libellee for salvage compensation, asking for $10,000.00, alleging the net tonnage of the

libellee to be 1831, her value to be $150,000.00, her cargo to be worth $65,000.00, and that freight money was earned in the amount of $5,000; also alleging that the libellee was full length ashore on a coral reef in a position of great peril; that a heavy swell was running during that day, increasing in violence toward evening; and that the said steamships Ke Au Hou and Kinau were in great peril in consequence thereof and because of their proximity to the reef; that the value of the Kinau was $200,000 and that of the Ke Au Hou $45,000; that the libellee was floated by means of said vessels and their masters and crews and some assistance rendered by said Revenue Cutter Manning; and that had it not been for such service by the ships and crews of the libelant, the libellee would have become a total loss.

The answer of claimant denies the peril of the salving steamers of the libelant, the peril of the libellee while stranded and that a heavy swell, or any swell whatever, was running at the time; that the Kinau exerted the full power of her engines and strained continuously on the hawser; that the libellee was floated by the efforts of the Kinau and Ke Au Hou; alleging that the Ke Au Hou rendered no assistance whatever and that the greatest assistance was rendered by the United States ship Manning. It also denies that the libellee would have been a total loss or a partial loss without the efforts of the said two steamers of the libelant, through the skill and care of their masters and crews. The answer admits generally the statement of the case with which this decision opens, and alleges that the libellee was floated solely through her own efforts and those of the Manning, save and except some slight assistance rendered by the steamship Kinau. It denies that the libellee was worth over $60,000 or that her cargo was worth over $60,000, and admits that she had earned freight money in the sum of $5,000. The answer also denies that the steamers Ke Au Hou and Kinau were well equipped for salvage purposes, and alleges that the bottom where the libellee was stranded was a sandy one

and that she was resting thereon for a distance of about fifty feet from her stem.

The subordinate issues of fact on which the estimate of compensation must be based are the questions of peril to the salving vessels considered in relation to their values, the question of peril to the libellee considered in relation to its value, the question of the condition of the sea and wind, and the amount of assistance given by the libelant's vessels, to be considered in relation to the assistance rendered by other agents, promptness of libelant in coming to the rescue of libellee, and skill and courage shown; also the question as to the character of the bottom on which the libellee was lying and the extent of her stranding. *The Versailles,* 1 Curtis 361: 11 Fed. Cas. (No. 6,365) 1128; 2 Parsons, Shipp. & Adm. 293; *Queen of the Pacific,* 21 Fed. Rep. 459, 472.

As to the condition of the sea and wind, the testimony has been somewhat conflicting, there being a tendency on the part of claimant's witnesses to make out, in accordance with the answer, that there was no swell to amount to anything. The testimony of several masters of long experience in island and coasting trade was definitely to the effect that there was a considerable swell; that although there was no wind early in the morning, the wind came up from the southeast, which tended to increase the swell inshore. Leaving this evidence aside pro and con, we have the circumstantial evidence of the breaking of the lines by which the Pioneer, a steam scow which came twice during the time the libellee was stranded, to take her passengers ashore. There is no question whatever that she had considerable difficulty in tying up to the port side of the Chiusa Maru, and that both her bow and stern lines kept breaking on her first trip. These were old five inch lines which were replaced on the second trip by new lines of the same size, but which new lines still continued to break both fore and aft. Neither the theory that the tide was running out in a smooth sea nor that an inshore current caused by the propeller of the Chiusa Maru backing water could explain these repeated part-

ings of the lines, especially as these two forces would tend to neutralize each other. They can only be accounted for in my opinion by the fact that there was a considerable swell running, which moved the Pioneer backwards and forwards and up and down to a sufficient extent to produce the results mentioned. To have done this, especially with the new lines, there must have been a considerable swell. It is well understood that a wave in deep water, which is low in proportion to its width, as it reaches shallow water and feels the effect of the bottom, tends to increase in height and violence. This may have been the case in this matter, or may not, but I am satisfied that the testimony in regard to a considerable swell from the southeast is to be accepted.

The Chiusa Maru grounded bow on in a northerly direction. The examination of her bottom in the dry dock at Kobe, after her return there, showed the paint scraped off on her port side beginning about fifty feet from the stem and running aft about thirty feet, with a width of about twelve feet from the keel toward the water line. The keel along this patch had the paint scraped off and also an area of several square feet on the starboard side opposite to it. On other parts of the ship's bottom the paint was scraped off in small patches or spots and from the keel in isolated places. The contention between the parties as to the nature of the sea bottom has a bearing on the question of the extent to which she was grounded. I accept the testimony of the local seamen that the bottom in that locality is coral with irregular patches of sand,—the sand, as it naturally would be, being lower than the coral. Even the claimant's own witness, Captain Combe, testified explicitly that as he was at the vessel in his launch he observed a coral ledge under the forehold. It was the impression of Captain Macaulay and Captain Haglund that she was grounded her whole length, judging from soundings. The vessel drew, according to Captain Mizuno, 21 and a quarter feet at the stern and 15 feet forward. The soundings showed 18 feet of water on the starboard side abreast of the stern post, 17 feet off the smoke stack on the port side, and 20

feet abreast of the smoke stack on the starboard side, according to Macaulay, and 19½ feet on the port side of the bridge according to Captain Mizuno. We know that she was aground on her keel and port side from 50 to 80 feet from the bow. The fact that her soundings were 18 feet at her stern post on the starboard side when she drew 21 and a quarter feet, would imply that she was aground at her stern, and yet her bottom does not show serious scraping except in the locality mentioned toward the bow on the port side, but does show scraping off of paint in spots in other places. I think the facts are these: The bottom in that locality is irregular coral with occasional crevices and depressions partially filled with sand. Resting somewhat solidly near her bow on her port side, the rest of the hull in places touched the more raised portions of the coral reef and in other places touched nothing, being over the depressions in the coral. So it might happen that soundings taken on the coral would be considerably less than soundings which might be taken close by in one of the depressions referred to. This condition of the sea bottom renders the few soundings that were taken of little value as a test of the extent to which the vessel was aground.

The question of the peril of the libellee was very much of an issue in the proceedings, the contention on the part of the claimant being that she was lightly aground in smooth water near a port where all kinds of material for salvage purposes could be procured, to which port her cargo could easily be removed, and that in a little while the ship with her own appliances could have floated herself off safely; and also that there was a large, powerful steamer, the cable ship Restorer, which might have come to her assistance later on. It is in testimony that at the time of year at which she stranded, winds from the south, southwest and southeast are liable to occur and that in such weather she would be on a lea shore exposed to the open sea. It is a matter of general knowledge in these islands that such is the case and the court does not hesitate to take judicial knowledge of this fact. Vessels have been driven ashore on the reef

near the harbor at different times by southerly gales and totally wrecked. Such storms are liable at any time from the first of October to the last of March, and with such weather coming on, salvage operations would have quickly become impossible, and it would have taken but a few hours to have entirely wrecked the libellee. Looking at the situation in the most favorable aspect for the libellee it cannot be said that she was not in a perilous situation and one that demanded prompt measures for her safety. With her bow aground as stated and the rest of her hull only slightly touching the coral, the tendency, as has been shown by the testimony, of the wind and sea to swing her around broadside on the reef is obvious. Whether there was enough sea to have done this is an issue in this case. Captain Macaulay, Captain Haglund and Mr. Young say that there was motion of the hull caused by the waves; others deny it. It is proved beyond question that the plates of the hull at the large locality where the paint was scraped off were depressed to a depth of one inch, in how long a space we do not know exactly. That would tend to show an effect caused by some working of the ship on the reef, as it does not appear likely that simply her sliding on this reef at the slow speed testified to would have produced it. The Chiusa Maru had reversed her engines but had not acquired stern way. Captain Mizuno of the Chiusa Maru testified, "It was so slightly felt I even myself was not sure whether she touched or not at that time." (Tr. p. 295.)

The Ke Au Hou appeared early on the ground and offered her services, which being accepted, she promptly went to work to do the best thing to be done at that time, which was to keep the stern toward deep water and to prevent it from swinging. The Ke Au Hou is a boat of 193 tons register and 250 horse power. The claimant contends that her services were utterly worthless. During the time she was pulling, the hawser became worn at its fastenings and it became necessary for her to slow down and slacken the hawser in order that it might be readjusted, which was done,—taking half an hour. Captain Haglund testified that during this time when the hawser was

slackened, the stern of the Chiusa Maru swung westward or to port two or three points. This fact was not referred to by other witnesses and was not denied. The fact of the chafing of the hawser, with this more important fact of the stern of the Chiusa Maru swinging off to port as soon as the Ke Au Hou slackened her engines, is certainly significant of an exertion on her part of a force which was of value to the libellee,—probably of great value. The Kinau promptly appeared on the scene after her arrival at Honolulu, as soon as her passengers and mails could be landed, offered her services and on being accepted, went to work in the best position, according to Captain Macaulay and Captain Haglund, because it was toward deep water,—furnishing her own hawser and keeping her engines going at full speed until the Chiusa Maru was floated. The conduct of the masters of the Ke Au Hou and Kinau was highly creditable and stands in marked contrast to that of the master of the Fearless, which arrived first on the ground and who declined to do anything without a promise of $20,000 salvage,—conduct most discreditable because of his attempt to take undue advantage of a ship in distress, and most unbusinesslike because no court of admiralty would sustain an unconscionable contract forced on a ship under such circumstances. The Kinau was of 773 tons net tonnage with a horse power of 800. At 12:30 p. m. the Manning began to pull toward the southwest, a disadvantageous position, because pulling toward shallow water, or uphill. Her steam power, she having only two boilers in commission, was 800 horse power. In about an hour after she took hold the Chiusa Maru was floated. Captain Macaulay, a Honolulu pilot, was on the Chiusa Maru during the whole period of the salvage operations, and was evidently accepted by the master as his agent for the conduct of such operations. So far as appears he was a wholly disinterested witness.

As in all cases where several different forces are working together, it is difficult to exactly decide on the comparative assist-

ance given by each agent.  The fact that the vessel came off in about an hour after the Manning began to pull does not prove· necessarily that the salvage was mainly due to the latter.  The tide was rising and no one can say how much force was re=quired beyond that of the libelant's ships and the libellee's own propeller to float the ship.  Undoubtedly the Manning's assist-ance accelerated her salvage.  The propeller of the libellee must have had much to do with getting her off, how much it is im-possible to say as there is no testimony as to her speed or the steam power she was using.  The assistance afforded by Cap-tain Macaulay, who appears to have been accepted by the ship as director of the salvage operations, was a considerable ele-ment in such operations.  As he appears here only as a witness, the court is ignorant of his own view as to the value of his efforts and takes it for granted that that has already been set-tled satisfactorily to him.  In any case he was entitled to ma-terial compensation.

The issue may be considered briefly as this: The ship, with her own engines reversed, engaged the two ships of the libelant to assist in her salvage, conducting operations through its own agent,—Captain Macaulay.  An anchor was put out from the libellee, and the Manning, later in the day, assisted.  I gather from all the evidence, although there is some conflict, that the kedge anchor put out by the Chiusa Maru was of no value in the salvage operations and finally became a great impediment in that the hawser attached to it, as the ship floated off, was in danger of being entangled with the propeller and so at that critical time the ship's engines had to be stopped and the im-portant work of taking charge of her for the next few minutes· devolved on the Ke Au Hou.  This was a critical moment as, without such assistance, the Chiusa Maru would have been in danger of stranding again or, according to the testimony, of· fouling with the Manning, she and the Kinau being at anchor.  The services of the Ke Au Hou at this juncture were of pro-· nounced value and entitled to consideration in the estimate of compensation.

I find that there was no peril to the libelant's ships or crews nor hardships endured by the latter in the salvage operations worth considering in these proceedings. At no time did the ships come nearer than 200 feet of the libellee and their stations when pulling on her were an eighth of a mile or more from water shoal enough to have stranded them. The wind and the sea were in no way dangerous to steam vessels in their positions. The exigencies of the salvage operations did not require the display of a great amount of skill on the part of the masters of the libelant's salving vessels, but it appears that they exhibited all that was necessary.

The finding in a case like this must of necessity be to some extent arbitrary, based on facts and inferences from facts shown; also on the policy of courts of admiralty to view the work of salvors with liberality in order to encourage prompt efforts for the salvage of stranded vessels when everything may depend upon an early beginning of operations. In the Manchuria case lately tried in this court, there was considerable evidence, and as I remember, it was accepted as satisfactorily proved by both sides, that the Manchuria moved in over the reef after she stranded about six hundred feet during the first thirty-six hours, and it was one of the complaints of the claimant in that case that the situation was greatly and injuriously prejudiced by the fact that the Restorer was not on hand to possibly prevent such movement inshore.

In regard to the value of the libellee, I was greatly impressed with the thorough knowledge shown by the witness Captain Christiansen on the subject of the value of steam vessels, their engines and paraphernalia, with relation to the business of such ships in the Orient and in the Pacific Ocean, and I feel that his testimony as to her value, coming from a disinterested witness of whose competency the court is convinced, is entitled to great weight. I accordingly adopt his valuation of $124,000, which was supported by the testimony of his chief engineer, Eggan. The libellee admits the value of the cargo to be $60,000

and that freight money earned amounts to $5,000, making a total salved value of $189,000.

The long delay of the court in reaching a decision in this case suggests the question of interest. A case for damages differs from one for a liquidated amount in this regard. I think, however, that the loss of time should be considered in estimating the award.

I desire to commend the practice of some of the litigants in salvage cases before this court, of bringing their crews, which have assisted in the salvage operations sued on, into their applications for compensation. It is just that this should be done unless the crews desire to act independently. In the case before the court, the reference to the crews (par. 3 of libel), is somewhat vague in relation to their participation in the award, but I take it that it is such a recognition of their services as is intended to include them in the benefits of the proceedings, and yet there is no description of the crews which would enable the court to apportion their share of the compensation to be awarded, among them. The award therefore made herein is to include in its benefits a reasonable proportion to "the masters and crews of said steamers Ke Au Hou and Kinau and other servants of the Inter-Island Steam Navigation Company, Limited," according to the value of their services and the danger and hardships to which they were respectively exposed in the said salvage operations. *The Flottbek,* 112 Fed. Rep. 682, 685.

If the libelant should be allowed a compensation of $6,000 on the basis of being entitled to about one-half of the whole salvage earnings, if all others contributing to the salvage of the ship were in a position to demand remuneration, it would be slightly less than half of six per cent of the salved value, and this appears to me to be a reasonable estimate of the value of the libelant's services.

Decree may be entered for libelant in the sum of six thousand ($6,000.00) dollars, with costs.